**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Vonnie D. Darby, | ) | |
| | ) | **ORDER TO SHOW CAUSE AND** |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| State of North Dakota, | ) | Case No. 1:11-cv-071 |
| | ) | |
| Respondent. | ) | |

_____

Petitioner Darby has filed what will be construed as a petition for habeas corpus relief pursuant to 42 U.S.C. § 2254 naming the State of North Dakota ("State") as respondent. The petition has been referred to the undersigned for a report and recommendation.

Darby's petition and attachments are filed electronically at Doc. Nos. 2 and 2-1. Paper copies of the relevant state-court records are at Doc. No. 12 where Exhibits A1-A54 are the records for Darby's criminal case and direct appeal and Exhibits B1-B24 are the records for the collateral postconviction proceedings and subsequent appeal. Except as otherwise noted, the references to individual items of the state-court record will be by exhibit number.

## I.  BACKGROUND

In March 2007, Darby was convicted in state court of two offenses: burglary (Count I) and simple assault (Count II). (Ex. A43, p. 559). The trial court entered judgment on August 27, 2007, sentencing Darby to concurrent sentences of ten years imprisonment on Count I and thirty days on Count II. (Ex. A48). Darby's subsequent appeal was summarily denied by the North Dakota Supreme Court in a *per curiam* decision filed on March 20, 2008. State v. Darby, 2008 ND 43, 747

N.W.2d 136 (table). (Ex. A54). His writ of certiorari to the United Supreme Court was denied on May 19, 2008. Darby v. North Dakota, 553 U.S. 1058 (mem.) (2008).

Darby filed petitions for postconviction relief and for a writ of habeas corpus with the state district court in June and September 2008, respectively. (Exs. B4-B6). The court consolidated the proceedings and conducted an evidentiary that extended over several days, *i.e.*, June 16 and November 10 & 12, 2009. (Exs. B11-14). On December 7, 2009, the district court issued an amended order denying Darby's petitions for habeas corpus and postconviction relief. (Ex. B15).

Darby filed a motion for reconsideration, which the district court promptly denied, as well as a notice of appeal. (Doc. No. 2-1, pp. 11-23, 24-25). On September 21, 2010, the North Dakota Supreme Court summarily affirmed the state district court's amended order. Darby v. State, 2010 ND 180, 794 N.W.2d 898 (table). (Ex. B23).

Undaunted, Darby petitioned the United States Supreme Court for a writ of certiorari. His petition was denied on April 4, 2011. Darby v. North Dakota, __ U.S. __, 131 S.Ct. 1826 (mem.) (2011).

On September 1, 2011, Darby filed his present § 2254 petition for habeas relief.[1] (Doc. No. 2). Before the court now is the State's motion to dismiss (Doc. No. 17).

---

[1] Darby filed an earlier petition for habeas corpus pursuant to 28 U.S.C. §§ 2241 & 2254 in which he requested an order that he be released from state custody on bail pending completion of his state postconviction appeal to the North Dakota Supreme Court or that the state courts be directed to conduct a bail hearing. The court denied Darby's petition as well as a certificate of appealability. See Darby v. Schmalenberger, No. 1:10-cv-056, 2010 WL 3951948 (D.N.D. Oct. 8, 2010) (adopting Report and Recommendation dated Sept. 24, 2010, 2010 WL 3982204). Darby then sought a certificate of appealability from the Eighth Circuit, which was denied on March 28, 2011. Darby v. Schmalenberger, No: 10-3717 (8th Cir. Mar. 28, 2011). The State does not contend that Darby's present petition is a "second and successive" petition requiring circuit court permission for its filing under 28 U.S.C. § 2244(b)(3)(A).

## II.    TRIAL EVIDENCE

Before turning to a discussion of Darby's claims, it is helpful first to consider the evidence presented at trial and the reasons why the evidence of Darby's guilt was overwhelming, since it provides context for what follows and is also relevant to the recommended disposition of certain claims.

### A.    What happened at trial

#### 1.    Introduction

Darby was charged with the burglary of the Uno Chicago Grill in West Fargo, North Dakota, and the simple assault of one of its employees.  The State presented evidence that Darby entered the backdoor of the restaurant at approximately 8:25 a.m. on October 2, 2006, before the restaurant was open for business, purportedly seeking an application for employment, but soon thereafter committed the burglary and assault upon one of the restaurant employees.

At trial, the State called three of the restaurant's employees to testify, all of whom identified Darby as being the person who committed the offenses.  The State also called several law enforcement officers to testify about the investigation.

Darby, who represented himself at trial, called two witnesses in an unsuccessful attempt to establish an alibi defense.  Darby himself did not take the stand.

The trial transcript is contained in Exhibits A41- A43.  The references below are to the page numbers of the transcript.

#### 2.    Prosecution witness Ciro Delagarza

The first witness called by the State was the restaurant's kitchen manager, Ciro Delagarza. Delagarza was the first person to encounter Darby after he entered the back of the restaurant.

Delagarza testified he was putting food products away in the freezer when he first observed an individual, whom he did not know, in the hallway extending from the back door of the restaurant. He testified the stranger was a tall black male, wearing a bluish-colored beanie, a big puffy blue jacket, and jeans. He also stated the stranger had a small moustache and looked like a young "George Forman." He estimated the stranger's weight to be about 250 pounds. Delagarza pointed to Darby as being the person he saw that morning. (Tr. Tr. 61, 68-70, 88).

Delagarza testified he asked the stranger if he could help him and that the stranger responded by requesting an employment application. Because the restaurant was closed and not wanting the stranger to roam about freely, Delagarza took the stranger into the kitchen where two other employees were doing prep work and left him there while he went to get an employment application. The two employees were Pedro Gomez and Rebecca Bachmeier. Delagarza testified that, when he returned, he gave the stranger an employment application, advised he should fill it out and return it when the restaurant was open for business, and then escorted him to the back door and watched him exit the premises. (Tr. Tr. 70-74).

Delagarza testified he returned to the kitchen area, engaged in a discussion with Gomez and Bachmeier about what he perceived to be the oddity of the stranger's behavior, and decided to check on the restaurant's office because its door had been left open. Delagarza testified he encountered the stranger coming out of the restaurant's office carrying a cash box, but was able to wrestle it away. Delagarza stated he yelled for help and a minor scuffle ensued during which the stranger pushed him back. According to Delagarza, the stranger then exited the rear of the restaurant and that he, along with Gomez who had come to his assistance, followed the stranger out the door. Delagarza testified he was hoping to get a license number of the stranger's vehicle, but what he saw

instead was the stranger getting on a red "mountain bike" and pedaling away. Delagarza testified the reason why he thought the bike was a "mountain bike" was because it had straight handlebars and large tires. He also testified that the bike had a "big lockup chain." (Tr. Tr. 74-85, 92).

Delagarza testified that, a short time later, a police officer drove him over to an apartment complex to make an identification of a suspect whom the police had detained. When they arrived and while still seated in the patrol vehicle, the officer asked Delagarza if he could identify the man sitting on the outside stairs in the accompaniment of other law enforcement officers. Delagarza testified he advised the officer he could not make an identification without glasses and that the officer then gave him a pair of binoculars. Delagarza testified that, with the assistance of the binoculars, he was able to identify the person sitting on the steps as being the stranger he saw in the restaurant, even though the person at that point did not have his jacket on. He testified that, after he made the identification, he was able to identify a blue jacket that was held up by an officer, a red mountain bike with the same "big lockup chain" that was parked near the suspect, and a driver's license photo of Darby that was shown to him in the patrol vehicle. (Tr. Tr. 88-94).

Darby conducted an extensive cross-examination of Delagarza, but was unable to make any headway with respect to the essential aspects of Delagarza's testimony. (Tr. Tr. 94-169, 183-223). In particular, Darby questioned Delagarza about his eyesight. Delagarza testified he had no problems seeing things close up, just trouble seeing things from a distance. In response to Darby's questions and the State's questions upon redirect, Delagarza testified he had no problem identifying Darby and the red mountain bike with the binoculars after he adjusted the focus. (Tr. Tr. 99-101, 140-142, 227).

### 3.    Prosecution witness Rebecca Bachmeier

The State next called Rebecca Bachmeier.  She testified she was doing prep work in the kitchen on the morning in question when Delagarza entered with a stranger whom he left in the kitchen while he went up front.  When Delagarza returned, she saw him give the stranger an employment application and then follow the stranger out into the hallway leading to the rear door.  Bachmeier then observed Delagarza return to the kitchen, briefly talk with two other employees, and then go down the hallway toward the area of the office.  She testified the next thing she observed was Delagarza in the hallway leaning back like he had been pushed and his yelling to Gomez for help.  At that point, suspecting there was trouble, Bachmeier went to the front of the restaurant to get the restaurant manager and did not see the stranger again.  (Tr. Tr. 230-240).

Bachmeier testified the stranger was tall, black, "kind of built," and that he had a coat and hat on.  She identified Darby in the courtroom as being the individual she saw on that day and testified she had no doubt about Darby being that person.  (Tr. Tr. 232, 236, 240, 267).  Darby cross-examined Bachmeier without any apparent success in casting doubt upon her testimony.  (Tr. Tr. 241-275).

### 4.    Prosecution witness Pedro Gomez

Pedro Gomez was the next person called to testify.  Gomez's testimony mirrored that of Bachmeier with respect to Delagarza bringing a stranger into the kitchen and their being told the stranger was interested in employment. Gomez testified he did not pay much attention at that point and kept working.  He stated the next thing he remembered was Delagarza coming back into the kitchen after the stranger had left and remarking about the stranger's odd behavior.  Gomez testified that Delagarza then left the kitchen to go to the office and soon thereafter yelled out his name.

Gomez stated he then ran into the hallway and observed Delagarza and the stranger whom he had seen earlier wrestling over a cash box, which Delagarza was able to secure and put down next to Gomez. The stranger then exited out the back door. Gomez testified that he and Delagarza followed and observed the stranger leave on a bicycle. Gomez stated it was a "mountain bike," but could not recall its color. (Tr. Tr. 279-291).

Gomez described the individual in question as being a black male around six feet in height who was wearing a blue coat and a beanie. He identified Darby in the courtroom as being the individual he saw. (Tr. Tr. 284, 289). Again, Darby cross-examined but with little apparent success. (Tr. Tr. 291-305).

### 5.    Prosecution witness officer Mark Morris

The State next called police officer Mark Morris of the West Fargo Police Department to testify. Morris was the first officer to arrive at the restaurant following the report of the burglary. Morris testified the that restaurant employees described the suspect generally as being a black male, approximately 6 feet tall and 250 pounds, who was wearing a dark-colored winter jacket and blue jeans and who left riding a red mountain bike. (Tr. Tr. 329-31).

Morris testified that he then searched the surrounding area in his patrol vehicle and, after not being able to locate the suspect, returned and interviewed Delagarza. Morris's testimony of what Delagarza told him essentially mirrored Delagarza's earlier testimony. Upon completion of that interview, Morris was advised by radio that Fargo Police had detained a person matching the description of the suspect at an apartment complex in Fargo approximately a mile from the restaurant. Morris stated he proceeded to the location and observed the fact that the suspect matched the description given by the restaurant employees. He testified he then returned to the

restaurant to get Delagarza to take him to the location to see if Delagarza could make a positive identification. (Tr. Tr. 331-40).

Morris testified that, upon their arrival at the apartment complex and while still seated in his patrol vehicle, he asked Delagarza whether he could recognize the person who was being detained and that Delagarza advised him he could not without glasses. Morris stated he then handed Delagarza his binoculars and that Delagarza was then able to identify not only the suspect as the person involved in the burglary, but also the suspect's jacket when it was held up by another officer as well as a red mountain bike with a big lock parked near where the suspect was seated. Morris testified that afterwards he showed Delagarza a driver's license photo taken from the person being detained, who was Darby. He stated that Delagarza identified the person in the photo as being the burglar. When asked why he had Delagarza make the identification of the suspect from the patrol vehicle, Morris stated he felt Delagarza might feel less threatened if the identification was made in this manner, since the suspect had an encounter with him and knew where he worked. (Tr. Tr. 340-45).

Darby cross-examined Morris at some length, implying by his questioning that Morris, as well as the other investigating officials, had conducted a slipshod investigation. In particular, Darby implied that the police had relied upon a witness description of the suspect that was too vague because nothing was said about the suspect's facial features or his apparent age; he questioned the fact that no fingerprints were taken from the cash box; and he questioned the procedures used to obtain the identification made by Delagarza, implying they were unduly suggestive. (Tr. Tr. 350-79).

### 6.    Prosecution witness Detective Derek Cruff

The State's next witness was West Fargo Detective Derek Cruff.  Cruff testified he was in his vehicle when he heard a dispatch about a robbery at the Uno Chicago Grill and that the suspect was a black male wearing a winter-style coat and stocking cap who had fled eastbound on a red mountain bike.  Cruff testified that he assisted in the search, which involved four West Fargo patrol vehicles and three Fargo units.  He testified that no person matching the description of the suspect was located immediately east of the restaurant, but that a suspect matching the description was spotted by Fargo Police outside an apartment complex further east and approximately a mile from the restaurant.  (Tr. Tr. 381-88, 393-97).

Cruff testified that, upon being advised that Fargo Police had detained a suspect, he traveled to the location where the suspect was being held.  He testified that the suspect was a black male who matched the description given by the witnesses and who was wearing a heavier blue winter-style coat, a bluish - almost black - beanie-style stocking cap, and jeans.  He also observed nearby a parked red bicycle that matched the description given by the witnesses, including a big lock.  Cruff testified that he then identified himself as a detective and advised the suspect of his <u>Miranda</u> rights. He testified that the suspect, who had been identified by Fargo Police as Darby, stated he wished to have an attorney present and that all questioning then ceased.  (Tr. Tr. 397-99, 424-27).

Cruff testified he was aware that officer Morris had gone back to the restaurant to pick up one of the witnesses to see if a positive identification could be made.  He testified that he placed Darby under arrest after being advised by officer Morris that the witness had positively identified the suspect as being the burglar.  (Tr. Tr. 403-05).

Cruff then proceeded to the restaurant to take over the investigation of the burglary. He viewed the premises, further questioned Delagarza, and observed the cash box and the office safe where the cash box had been located. Cruff testified he learned the safe had been left partially open by the manager earlier that morning prior to the burglary. He stated he elected not to have the cash box fingerprinted because he doubted they would be able to obtain usable prints given its smooth surface and the fact that the tussle over the cash box would likely have caused any fingerprints to become smudged. Also, he stated they already had a suspect in custody whose description and apparel matched the initial reports, who was found only 16 minutes after the initial call to the West Fargo Police Department in the direction where the suspect was reported having fled and near a parked red mountain bike, and who was subsequently identified by one of the restaurant employees. (Tr. Tr. 406-24).

Darby cross-examined Detective Cruff, again implying by his questions that the police investigation was faulty because of the failure to obtain fingerprints from the cash box and safe and because they relied upon too general a description. He also questioned Cruff about the discrepancy between the Delagarza's estimate of the weight of the burglar being 250 pounds and his own weight as being 220 pounds according to his driver's license and the fact that none of the witnesses stated the suspect was bald, which he purportedly was according to his driver's license photo. (Tr. Tr. 429-51, 469-82).

Following Darby's cross-examination of Cruff, the State's prosecutor asked a few additional questions on redirect. The last question that the prosecutor asked, which later became a point on appeal, was the following:

> Q.    Detective, based on your investigation is there any doubt in your mind that Mr. Darby committed the crime?

(Tr. Tr. 484). Why the prosecutor felt compelled to ask this question is not entirely clear, but possibly it was in response to Darby's questioning of both officer Morris and Cruff that implied the investigation was faulty and that they had gotten the wrong person as result. In any event, Darby did not object and Detective Cruff answered "no." The State then rested its case. (Tr. Tr. 484).

### 7. Defense witnesses

Darby called two witnesses, both of whom were employees at another nearby restaurant, Kroll's Diner on 45th Avenue in Fargo, where Darby had once been briefly employed. Darby called the witnesses in an attempt to establish that he was in Kroll's Diner eating breakfast during the time of the burglary, which was on a Monday.

The first witness testified that he recalled Darby being in Kroll's one morning, sometime between 7:00 a.m. and 9:00 a.m., during the general time frame of the robbery, but could not recall the exact day. The second witness recalled Darby being in for breakfast, most likely between about 8:00 a.m. and 9:00 a.m., on what she believed was likely the Monday in question, but she was not positive. There was also questioning of both witnesses about the length of time Darby was in the restaurant and both testified it was only for a short period of time with both estimating it was just short of 20 minutes. The import of this questioning was that Darby could still have committed the burglary, even if he had been in Kroll's Diner first that morning, given the short time he was in the restaurant, the lack of precision as to exactly when, and the proximity of Kroll's to Uno Chicago Grill. (Tr. Tr. 488-96, 504-19).

After deliberating for about two hours, the jury returned guilty verdicts on both the burglary and simple assault charges. (Tr. Tr. 558-59).

## B.    Evidence against Darby was overwhelming

During final argument, Darby contended that the State had failed to prove beyond a reasonable doubt he was the burglar, focusing in particular upon: (1) his personal characteristics and facial features that he contended would have been observed by the witnesses had he been the burglar; (2) the failure of the police to conduct a more thorough investigation, including the failure to take fingerprints off the cash box, safe, and areas in the restaurant that may have been touched by the burglar, the failure of the police to get a better description of the burglar from the witnesses, and the failure of the police to note in their reports the time of the burglary; (3) the allegedly suggestive identification procedures that were used; and (4) the alibi witnesses that Darby contended placed him in Kroll's Diner at the time of the burglary.   (Ex. A43, pp. 539-51).

The problem for Darby, however, was that all three of the restaurant employees, who identified him at trial as the person having committed the charged offenses, had the opportunity to see him closeup prior to any crime being committed and under conditions that were not threatening or stressful.  In addition, one of the witnesses was able to make an unequivocal identification of Darby as the perpetrator within a short time after the commission of the offenses.  Further, and perhaps even more damning for Darby, was the corroborating circumstantial evidence, which included: (1) the descriptions of the burglar's race, overall physique, and clothing given to the police by the three restaurant employees prior to Darby being found that were consistent with each other and that closely matched Darby's physical appearance and apparel; (2) the accounts of the burglar's flight on a mountain bike given by two the employees, with one of the employees further describing the mountain bike as being red in color with a big lock; and (3) Darby being found within a short time after the burglary in the general area where the burglar was reported heading and in the

immediate vicinity of a red mountain bike with a big lock.  Finally, the so-called alibi witnesses were equivocal about whether Darby was in Kroll's Diner on the day of the burglary and, even if he had been, the general estimates that they gave as to when did not foreclose Darby from having committed the burglary and, in fact, placed him in close proximity to the scene of the crime.

As for the charged offenses, two of the restaurant employees saw Darby with the restaurant's cash box, with one witnessing him coming out of the restaurant's office with it in hand.  Further, there was evidence this occurred after he had been escorted to the exit of the premises following his obtaining an employment application, suggesting clearly his reentry or his surreptitiously remaining on the premises was for a unlawful purpose, even if his original entry was for a lawful purpose and his asking for an employment application was neither an excuse for his presence nor a ruse to case the restaurant.  See N.D.C.C. § 12.1-22-02.  With respect to the charge of simple assault, two of the employees had first hand knowledge of the assault - one being the victim and another a witness.  In addition, the third employee saw the assaulted employee leaning back like he had been shoved, just prior to his yelling for help.

In short, the evidence was overwhelming that Darby committed both the burglary and the simple assault.

**III.**     **SCOPE OF REVIEW**

Under 28 U.S.C. § 2254, a federal court may review state-court criminal proceedings to determine whether a person is being held in violation of the United States Constitution or other federal law.  In most cases, this review is limited because, as a matter of federalism and comity, the primary responsibility for ensuring compliance with federal law in state criminal proceedings rests with the state courts.  See, e.g., Harrington, __ U.S. __, 131 S.Ct. 770, 787 (2011) ("Harrington").

In keeping with this policy, § 2254(d) limits federal-court review of cases where the state courts have addressed the federal claims on the merits to instances when a person is being held in custody pursuant to a state-court decision that (1) is directly contrary to established federal law as enunciated by the United States Supreme Court, (2) is an objectively unreasonable application of Supreme Court precedent, or (3) is based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding. See 28 U.S.C. § 2254(d); see generally Harrington, 131 S.Ct. at 784-785; Williams v. Taylor, 529 U.S. 362, 399-413 (2000). This highly deferential standard of review under § 2254(d) is often referred to as "AEDPA deference" because it was enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). E.g. Pederson v. Fabian, 491 F.3d 816, 824-825 (8th Cir. 2007); see generally Renico v. Lett, 559 U.S. __, 130 S.Ct. 1855, 1862 & n.1 (2010).

## IV.  DISCUSSION

### A.  Introduction

Darby sets forth 107 separately numbered "questions" in his petition. While some of the "questions" raise claims that have been properly exhausted, a number do not and are now barred from further state-court consideration on grounds of procedural default. In addition, a number of Darby's "questions" are mere arguments about points of law, rhetorical questions about the fairness of certain procedures, or excuses for lack of proper exhaustion, and, hence, do not present cognizable § 2254 claims. Finally, several of Darby's "questions" are simply incomprehensible.

Darby took a similar "shotgun" approach during his state-court proceedings, refusing the advice of several court-appointed attorneys to take a more focused approach. This has made it difficult to untangle what is now properly before the court and what is not.

In addition, the State quite rightly raises several objections with respect to Darby's lack of compliance with the statutes and rules governing § 2254 petitions. These points will be addressed before turning to a discussion of Darby's individual "questions."

### B.    State's objections to the form of Darby's petition

#### 1.    Failure to verify the petition

The State contends that Darby's petition should be dismissed because it was not verified as required by 28 U.S.C. § 2242 and Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts ("Rules Governing § 2254 Cases"). However, the lack of verification is not jurisdictional. See, e.g., Hendricks v. Vasquez, 908 F.2d 490, 491 (9th Cir. 1990). And here, Darby signed the petition and its lack of verification will not substantively impact the court's decision. Hence, it is recommended that this point of noncompliance be disregarded. See id.

#### 2.    Failure to name the proper respondent

The State also asks that Darby's petition be dismissed for failing to name the correct respondent. Instead of naming the state officer who has custody over him as required by 28 U.S.C. § 2242 and Rule 2 of the Rules Governing § 2254 Cases, Darby named the State of North Dakota.

The prevailing view is that the requirement of naming the correct custodian is not jurisdictional in the sense of subject matter jurisdiction, but rather is more in the nature of a personal jurisdiction requirement, which, among other things, is subject to waiver or being cured by amendment. See, e.g., Smith v. Idaho, 392 F.3d 350, 352-56 (9th Cir. 2004); McMaster v. City of

Troy, 911 F.2d 733 (table), 1990 WL 116540, at *3 (6th Cir. 1990) (unpublished per curiam); Byrd v. Martin, 754 F.2d 963, 965 (11th Cir. 1985); West v. Louisiana, 478 F.2d 1026 (5th Cir. 1973), vacated in part on other grounds, 510 F.2d 363 (5th Cir. 1975); cf. Rumsfeld v. Padilla, 542 U.S. 426, 452 (2004) (Kennedy & O'Connor, JJ., concurring) ("Because the immediate-custodian and territorial-jurisdiction rules are like personal-jurisdiction or venue rules, objections to the filing of petitions based on those grounds can be waived by the Government."); Mathena v. United States, 577 F.3d 943, 946 n.3 (8th Cir. 2009); but see Stanley v. California Supreme Court, 21 F.3d 359 (9th Cir. 1994).

In this case, there is no dispute over the fact that Darby is incarcerated at the North Dakota State Penitentiary ("NDSP") and that, as a consequence, his petition is before the proper court. In addition, the NDSP's warden is the State's agent, and the State has appeared and been represented by the Attorney General's Office, which ordinarily defends the NDSP's warden in most of the § 2254 cases in this District. Also, the State has fully defended against the granting of the petition on grounds other than just failure to name the immediate custodian. Finally, since the court has subject matter jurisdiction, Darby is bound by any dismissal of his petition. Given these circumstances, the failure to name the correct respondent can probably be overlooked notwithstanding the State's objection.

That being said, it will be recommended that the court *sua sponte* order the substitution of the NDSP's warden for the State as the party respondent in this case, taking judicial notice that the current warden is Robyn Schmalenberger. E.g., West v. Louisiana, 478 F.2d at 1029 (suggesting that the district court could have amended the petition on its own initiative substituting the immediate custodian for the named respondent, which was the State of Louisiana); Crain v. Cooper,

No. 1:09–cv–216, 2011 WL 4596112, at *3 (W.D.N.C. Sept. 30, 2011) (the court on its own amended the petition to name the proper respondent). Further, it will be ordered below that the parties show cause why this amendment should not be made. This should eliminate the issue.

### 3. Failure to allege facts in the petition

The State also alleges other procedural violations, including the failure to state facts supporting the claims in the petition and the purported inclusion of other grounds in what the State has characterized as a separate 53-page memorandum in violation of the requirements of Rule 2 of the Rules Governing § 2254 cases. In addition, the State contends that Darby's petition is defective for not following the standard form required by Rule 2 of the Rules Governing § 2254 Cases.

With respect to the first point, it appears clear that Darby intended his listing of his 107 "questions" and his 53-page argument in support, together, to be his operative pleading. Not only was it submitted as one document, the formatting also suggests it was intended to be one pleading. Similar to an appellate brief, Darby listed the "questions" for consideration in the first pages of the document, numbering those pages with roman numerals. He then set forth his grounds and argument in the remaining part of the document, numbering those pages with regular numbers. Consequently, while the State may be correct about a number of claims being deficient in terms of stating facts and grounds for the claims, that is not true for all of them, particularly when his listing of his 107 questions and his 53-page argument is construed as a whole.

As for the State's second and more legitimate point, Rule 2(d) of the Rules Governing § 2254 Cases does require use of the standard form appended to the Rules or a form prescribed by local district-court rule. However, based on the authority previously cited, lack of compliance with this requirement would not deprive the court of jurisdiction and is something that can be disregarded in

the court's discretion.  And, in this case, there are good reasons for simply dealing with Darby's claims as he has presented them.  First, the State has already addressed Darby's claims in its motion to dismiss following the format used by Darby.  Second, it likely would be error to dismiss this proceeding without giving Darby the opportunity to file an amended petition using the prescribed format, particularly since he is proceeding *pro se*.  That being the case, requiring Darby to redo his petition would likely result in the State having to expend considerable effort in preparing a new response and amended motion to dismiss, which at this point is unnecessary.  Third, the work product from Darby will likely not be any better, given his prior track record, and may very well result in making an already confusing situation worse.

In short, the expedient path to follow at this point is to simply deal with Darby's claims in their present format.

### C.    State's arguments of lack of proper exhaustion and procedural default

#### 1.    Governing law

##### a.    The exhaustion requirements

The exhaustion doctrine codified at 28 U.S.C. § 2254(b)-(c) precludes granting habeas relief for claims that have not been properly exhausted in the state courts.  E.g., Rhines v. Weber, 544 U.S. 269, 274 (2005); Dixon v. Dormire, 263 F.3d 774, 777 (8th Cir. 2001).  Proper exhaustion has two components.  First, the claim must be "fairly presented," which requires that the petitioner present both the factual and legal premises for the claim, with the latter being satisfied if there is a reference to the particular federal constitutional right or a citation to a state or federal case that raises the constitutional issue.  Dansby v. Norris, 682 F.3d 711, 722-23 (8th Cir. 2012); Carney v. Fabian, 487 F.3d 1094, 1096 (8th Cir. 2007).  Second, the petitioner "must give the state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addition, there are three other aspects of the exhaustion doctrine that are important. The first is that the exhaustion doctrine is satisfied if there are no state-court remedies available and exhaustion would be futile, such as when the claim has been procedurally defaulted at the state-court level. E.g., Armstrong v. Iowa, 418 F.3d 924, 926-27 (8th Cir. 2005). The second is that Rose v. Lundy, 455 U.S. 509 (1982) prohibits a petitioner from proceeding with a "mixed petition" of exhausted and unexhausted claims. See also Rhines v. Weber, 544 U.S. at 273-74. The third is that § 2254(b)(2) authorizes the court to deny a claim on the merits notwithstanding a failure to exhaust. E.g., Gringas v. Weber, 543 F.3d 1001, 1003 (8th Cir. 2008).

### b.    Procedural default

A federal district court is precluded from substantively considering a habeas claim that has been procedurally defaulted at the state level on independent and adequate state grounds. E.g., Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). State procedural grounds are independent and adequate if they are firmly established, readily ascertainable, and regularly followed. Barnett v. Roper, 541 F.3d 804, 808 (8th Cir. 2008); Franklin v. Luebbers, 494 F.3d 744, 750 (8th Cir. 2007). They must also further a legitimate state interest and not be applied in an exorbitant manner. Barnett, 541 F.3d at 808.

The rule barring procedurally-defaulted claims is nearly absolute. Cagle v. Norris, 474 F.3d 1090, 1099 (8th Cir. 2007). The only exceptions are the rare instances when a prisoner is able to meet the strict cause and prejudice or actual innocence standards. E.g., Arnold v. Dormire, 675 F.3d 1082, 1087 (8th Cir. 2012); Dretke v. Haley, 541 U.S. 386, 392-93 (2004).

### c.   State defenses of res judicata and misuse of process

Under N.D.C.C. § 29-32.1-12, res judicata and misuse of process are affirmative defenses in state proceedings for postconviction relief.  Res judicata is defined in subsection (1) to be a claim that was fully and finally determined in a prior proceeding.   Misuse of process is defined in subsection (2)(a) to include any "claim for relief which the applicant inexcusably failed to raise either in a proceeding leading to judgment of conviction and sentence or in a previous postconviction proceeding[.]"   These procedural defenses are regularly enforced by the North Dakota courts.  E.g., Tweed v. State, 2011 ND 228, ¶12, 807 N.W.2d 599; Steen v. State, 2007 ND 123,  ¶¶ 13-17, 736 N.W.2d 457; Laib v. State, 2005 ND 187, ¶¶ 6-7, 705 N.W.2d 845.

### 2.   State's arguments in this case

The State argues that many of Darby's claims have not been properly exhausted, so Darby's petition should be dismissed as a "mixed petition" under Rose v. Lundy, supra.  However, the State also argues that most of the same claims have been procedurally defaulted because they were not raised in an earlier state proceeding and are now barred from further state-court consideration under N.D.C.C. § 29-32.1-12.  If that is the case, the exhaustion requirements of § 2254(b) have been satisfied since the procedural default provides an independent and adequate state-law ground for denial of the claims unless the petitioner can establish cause and prejudice or actual innocence.  E.g., Gray v. Netherland, 518 U.S. 152, 161-62 (1996);  Welch v. Lund, 616 F.3d 756, 759-60 (8th Cir. 2010);  Armstrong v. Iowa, 418 F.3d at 926.  In other words, if the claims are procedurally defaulted, and not merely unexhausted, the claims do not make the petition "mixed."  Also, as discussed above, the court has the option under § 2254(b)(2) of considering claims that have not been properly exhausted on the merits if the claims are going to be dismissed.  Consequently,

between the claims in question being procedurally defaulted or the court considering and dismissing them on the merits, there will be no <u>Rose v. Lundy</u> "mixed petition" problem.

Finally, while the preferred order may be to address the question of procedural default first, the court can likewise address the claims on the merits when that is more expedient and the court is not going to grant affirmative relief. E.g., <u>Dodge v. Robinson</u>, 625 F.3d 1014, 1017 n.1 (8th Cir. 2010).

**D.    Questions 21-23, 25-27, 30, & 56 relating to claims raised on direct appeal**

**1.    Introduction**

In his direct appeal to the North Dakota Supreme Court, Darby raised the following three issues:

1.    The trial committed plain error in failing to *sua sponte* instruct the jury to disregard Detective Cruff's answer of "no" to the question of whether there was any doubt in his mind that Darby committed the crime.

2.    The trial court erred in ruling that the jail law library was adequate for Darby's needs after he elected to proceed *pro se* because the North Dakota Pattern Jury Instructions were not made available to him.

3.    The trial court committed plain error when, in sentencing, it subjected him to multiple punishments for the same offense.

(Ex. A50). Questions 21-23, 25-27, 30, & 56 in Darby's petition here cover the same subject matter. (Doc. No. 2). For ease of discussion, these claims will be addressed in the context of how they were raised in Darby's state appeal.

## 2.    The state court's disposition of the claims

The North Dakota Supreme Court summarily affirmed Darby's criminal judgment stating the following:

> [¶ 1] Vonnie Darby appealed a criminal judgment after a jury found him guilty of burglary and simple assault. Darby argued the trial court erred in not instructing the jury that a detective's testimony exceeded his ability to testify when the State asked whether he had any doubt in his mind that Darby committed the crime and he answered no. Darby also argued the district court erred as a matter of law in ruling the law library at the Cass County Jail was adequate. Finally, Darby argued the district court erred in sentencing him to multiple punishments for the same offense. We summarily affirm the criminal judgment under N.D.R.App.P. 35.1(a)(4) and (7). See State v. Voigt, 2007 ND 100, ¶ 8, 734 N.W.2d 787 (establishing that a defendant must raise double jeopardy issue before or during trial).

State v. Darby, 2008 ND 43. In construing the court's decision, it is important to note that N.D.R.App.P. 35.1 authorizes summary affirmance under (a)(4) when the district court did not abuse its discretion and under (a)(7) when a previous decision of the court is controlling with respect to the issue raised on appeal.

## 3.    Question 22 - opinion testimony of Detective Cruff

Darby, who as noted earlier was representing himself at trial, did not object to the prosecutor's question to Detective Cruff as to whether there was any doubt in his mind that Darby committed the crime. (Tr. Tr. 484). Since there was no objection, Darby's appellate counsel argued it was plain error for the trial court not to have *sua sponte* given a curative instruction. (Ex. A50, pp. 3-4).

In his petition here, Darby attempts to raise a federal constitutional claim with respect to the trial court's failure to give a curative instruction in Question 22. The State objects to consideration of this claim on the grounds that Darby did not present a federal constitutional claim when he argued

on appeal that the district court had erred in failing to give a curative instruction.  Hence, according to the State, any claim of federal constitutional violation for failing to give a curative instruction was not properly exhausted and, more importantly, has now been procedurally defaulted under state law.

The State's objection is well-taken.  Darby's state appellate brief made no reference to the United States Constitution with respect to the alleged error of failing to give a curative instruction, nor did it cite to a federal or state case making the same claim on federal constitutional grounds. (Ex. A50, pp. 3-4).  And, while Darby claimed in his state appellate brief that the failure to give the curative instruction denied him a "fair trial," this was not enough to put the state court on notice he was alleging a federal constitutional violation under the governing Eighth Circuit cases cited earlier. See also Turnage v. Fabian, 606 F.3d 933, 936-40 (8th Cir. 2010).

Consequently, Darby's claim in Question 22 (assuming it properly raises a federal constitutional violation) was not properly exhausted at the state-court level.  And, more importantly, Darby has now procedurally defaulted upon the claim given the state statutory bar against misuse of process discussed earlier, which renders his claim unreviewable here.[2]

### 4.      Questions 21 & 23 - lack of access to North Dakota Pattern Jury Instructions

Darby also argued in his direct appeal that his federal constitutional rights were violated because the county jail where he was housed prior to and during trial did not have a copy of North Dakota's Pattern Jury Instructions for him to use.  (Ex. A50, pp. 4-6).  As indicated above, this claim

---

[2] Even if this "fair trial" claim was not procedurally defaulted, Darby would not be entitled to relief.  This is because an "erroneous state-court evidentiary ruling violates the Due Process Clause only if it is gross, conspicuously prejudicial or of such import that the trial was fatally infected." Richardson v. Bowersox, 188 F.3d 973, 980 (8th Cir. 1999) (internal quotation marks and citations omitted).  In this case, the alleged failure of the trial court to *sua sponte* give a curative instruction was neither gross nor conspicuously prejudicial.  Also, in order to prevail on this point, Darby would have to show a reasonable probability that the error affected the outcome of the trial. Id.  This he cannot do given the strength of the State's case as discussed above.

was also denied by the North Dakota Supreme Court on the merits when the court concluded that the district court's denial of a motion directed to the adequacy of the county jail library was not an abuse of discretion.

Darby's claim with respect to lack of access to the pattern jury instructions is repeated here in Questions 21 & 23. (Doc. No. 2). There are several reasons why the claim fails.

First, the United States Supreme Court made clear in Kane v. Espitia, 546 U.S. 9 (2005) that its prior cases had not clearly established that prisoners proceeding *pro se* have a constitutional right to access a law library when the state has provided alternative legal resources in the form of court-appointed counsel and that resource has been voluntarily declined. In this case, Darby was afforded court-appointed counsel, but elected to proceed *pro se*. Consequently, the North Dakota Supreme Court's summary dismissal of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court, which is a necessary condition to federal habeas relief under 28 U.S.C. § 2254(d)(1) as discussed earlier. See also Kane v. Espitia, 546 U.S. at 10-11.

Second, a review of the state court records indicates that Darby did submit a number of proposed jury instructions prior to trial (Ex. A39), and he has failed to demonstrate here why he was unable to present additional proposed instructions if he had additional concerns - even if they were not pattern instructions. Further, when the trial judge gave the parties his preliminary thoughts about the instructions during the middle of the trial and asked for additional input, Darby responded by stating: "The instructions that I propose what I submitted on paper I will rely on that." (Tr. Tr. 311). In addition, Darby was asked twice after that whether he had any objections to the final draft of the

court's proposed instructions. His response, aside from objecting to the addition of a "flight" instruction, was that he was "standing silent." (Tr. Tr. 501, 520-21).

Third, Darby has failed to explain how, in any event, the instructions that were given were inadequate and denied him a fair trial.

In short, Darby's claim of lack of access to the pattern instructions fails on the merits.

**5.      Questions 25-27, 30, & 56 relating to Darby's double jeopardy claim**

Darby argued in his direct appeal that the elements of simple assault were encompassed within the crime of Class B burglary as defined by statute and that sentencing him on both convictions subjected him to multiple punishments for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment. Darby conceded in his state appeal, however, that this issue was not raised prior to or during trial, but argued that an exception should be made because he was proceeding *pro se* at that point. (Ex. A50, pp.7-10). Arguably, Darby's double jeopardy claim is encompassed in Questions 25-27, 30, & 56 of his current petition. (Doc. No. 2).

The North Dakota Supreme Court in its summary affirmance cited its earlier decision in State v. Voigt, 2007 ND 100, ¶ 8, 734 N.W.2d 787, for the proposition that a double jeopardy defense must be raised no later than during the trial. Given this, it appears clear that the court affirmed the district court's dismissal of the claim because it was not timely asserted. That being the case, Darby's procedural default forecloses consideration of his double jeopardy claim here, since the mere fact Darby was proceeding *pro se* at trial is not sufficient cause to excuse the default. See Brazeau v. Zon, No. 04-CV-031, 2007 WL 2903617, *19 (W.D.N.Y. Oct. 1, 2007) (failure on the part of defendant proceeding *pro se* during trial to comply with the state "contemporaneous

objection" requirement did not constitute "good cause' to excuse the procedural default); cf. Sherron v. Norris,

69 F.3d 285, 289 (8th Cir. 1995) (defendant proceeding *pro se* in direct state appeal) ("We have held that *pro se* status standing alone is insufficient to establish cause for a procedural default.").[3]

### E.    Questions 19, 31, 54, 59, 60, 62, 83-84, 92, 99 - claims of ineffective assistance of counsel

#### 1.    Background

Seven different attorneys were appointed to represent Darby at various stages of his criminal and postconviction relief proceedings, including appeals. Several did not last very long and were either replaced or Darby elected to proceed *pro se*.

More specifically, Darby discharged his court-appointed trial counsel, Monty Mertz, following the preliminary hearing after questioning his strategy and proceeded to represent himself during the discovery and motion phases of his pretrial proceedings and at trial. (Exs. A19, pp. 4-14; A20-A21). Darby was represented during the sentencing phase by Steven Mottinger, but only after the court would not permit Mottinger to withdraw at his request because of disagreements with Darby over strategy. (Exs. A46-A47). On direct appeal, Darby discharged the first court-appointed counsel, Benjamin Pulkrabek, over differences in the handling of the appeal, who then withdrew the brief he had filed in the North Dakota Supreme Court. (Ex. B14). Darby did permit, however, a second court-appointed attorney, David Ogren, to prepare and file a new brief. (Ex. A50). Later,

---

[3] Also, Darby was sentenced to thirty days in jail on the simple assault charge to run concurrently with his felony sentence of ten years on the burglary charge. (Ex. A48). Thus, it appears Darby's sentence on the simple assault conviction has long since run and that he is not now subject to any restraint or deprivation of liberty as a consequence of that conviction.

during his proceedings for postconviction relief, Darby prepared his own petitions and then went through two court-appointed attorneys, first Mark Blumer and then Kent Morrow. Darby discharged Morrow at the commencement of the postconviction hearing and represented himself during the hearing. (Exs. B3-B6; B11, pp. 4-12). Darby also proceeded *pro se* for virtually all of his appeal from the denial of petition for postconviction relief, including preparation of his own brief, after refusing the assistance of appointed counsel Robert Martin, who was allowed to withdraw. (Ex. B19, pp.4-5).

After the denial of his direct appeal, Darby filed *pro se* petitions for state postconviction relief and habeas corpus relief pursuant to N.D.C.C. chs. 29-32.1 & 32-22, respectively. (Exs. B4-B6, B8). Primarily, the petitions set forth claims of ineffective assistance of counsel against a number of his court-appointed counsel, which will be addressed here. The petitions, however, may possibly be read as also asserting "direct claims" that could have been raised earlier on direct appeal. These claims will be addressed later.

The state district court consolidated the petitions for postconviction relief and habeas corpus for hearing. After an extended hearing lasting several days, the district court issued a memorandum opinion dismissing both petitions. (Ex. B15). The court dismissed the habeas petition on the grounds that the later-enacted statutes governing claims for postconviction relief supplanted the more general state habeas provisions and that Darby's claims fell within the former. With respect to the petition for postconviction relief, the court denied the claims set forth in the petition on the merits. (Ex. B15).

Darby appealed the denial of his two petitions. In his brief, Darby devoted almost all of his attention to what arguably were "direct claims" and little, if any, attention to his claims of ineffective

assistance of counsel.  (Ex. B19).  The State, instead of responding to what Darby briefed and arguing abandonment of the ineffective-assistance claims, addressed the merits of those claims to the extent they were addressed by the district court.

Consistent with the State's briefing, the North Dakota Supreme Court summarily affirmed the district court's denial of the ineffective-assistance claims.  <u>Darby v. State</u>, 2010 ND 180. Further, it appears the affirmance was on the merits, given the court's reference to N.D.R.App.P. 35.1(a)(2), which allows for summary affirmance when "the judgment of the district court is based on findings of fact that are not clearly erroneous[.]"

Consequently, it appears that this court must address the claims that Darby makes now for ineffective assistance.  <u>See</u>, <u>e.g.</u>, <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989); <u>cf.</u> <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).   In considering the claims, the court should look to the district court's resolution of the claims, since its memorandum opinion was the last reasoned state-court decision on the subject.  <u>Mark v. Ault</u>, 498 F.3d 775, 783 (8th Cir. 2007) ("we apply the AEDPA standard to the . . .  'last reasoned decision' of the state courts").

### 2.    Law governing ineffective assistance of counsel

Under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) ("Strickland"), a defendant who claims ineffectiveness of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defendant.[4]  The test for deficient performance under the "first <u>Strickland</u> prong" is whether counsel's performance fell below an objective standard

---

[4]  There are three situations in which a Sixth Amendment violation may be presumed without consideration of the "performance" and "prejudice" components of <u>Strickland</u>: (1) when the accused is actually or constructively denied counsel during a critical stage of the criminal proceeding, (2) when counsel fails to subject the government's case to a meaningful adversarial testing, which failure must be complete and not limited to isolated portions of the proceeding, or (3) when circumstances are present that even competent counsel could not render effective assistance.  <u>E.g.</u>, <u>Bell v. Cone</u>, 535 U.S. at 695-697; <u>United States v. White</u>, 341 F.3d 673, 677-679 (8th Cir. 2003).

of reasonableness under prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 688; <u>Rompilla v. Beard</u>, 545 U.S. 374, 380 (2005).  When the issue involves a matter of trial strategy, there is a strong presumption that the strategy was sound and was not ineffective assistance.  See <u>Bell v. Cone</u>, 535 U.S. 685, 698-702 (2002). Likewise, the same holds true in judging trial counsel's performance with respect to claims of inadequate investigation.  See <u>Rompilla</u>, 545 U.S. at 380 ("In judging the defense's investigation . . . hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made . . . and by giving a 'heavy measure of deference to counsel's judgments.'") (quoting <u>Strickland</u> , 466 U.S. at 689, 691).  A state court's determination that a claimed error was a strategic decision by counsel is treated as a factual finding for purposes of federal habeas review.  See <u>Wood v. Allen</u>, 558 U.S.290, 130 S.Ct. 841, 849 (2010).

Under the "second <u>Strickland</u> prong," prejudice is only shown when there is "a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different[.]"  <u>E.g.</u>, <u>Woodford v. Visciotti</u>, 537 U.S. 19, 22 (2002) (per curiam) (quoting <u>Strickland</u>, 466 U.S. at 694 and adding emphasis).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 23 (quoting <u>Strickland</u>, 466 U.S. at 694).

When a state court has addressed a petitioner's ineffective-assistance claims on the merits and applied the <u>Strickland</u> test, a federal court must accord the state court's determination the deference required by 28 U.S.C. § 2254(d).  <u>Rompilla</u>, 545 U.S. at 380.  Assuming there are no issues with respect to the state court's findings of fact, the federal court's review is limited to the determination of whether the habeas petitioner has met the burden of proving that "the state court applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner."  <u>Woodford</u>, 537 U.S. at 25; <u>see also</u> <u>Rompilla</u>, 545 U.S. at 380.  The Supreme Court has characterized the application

of the <u>Strickland</u> standard through the prism of AEDPA as amounting to a "doubly deferential" standard of review.  <u>E.g.</u>, <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009).

### 3. Questions claiming ineffective assistance of pretrial counsel

Attorney Mertz was appointed to represent Darby at trial, but was discharged by Darby shortly after the preliminary hearing.  Although Mertz did not last very long, Darby makes several claims of ineffective assistance of counsel related to his representation.

#### a. Questions 59 & 92 - alleged failure to conduct an adequate investigation of alibi defense

Darby claims in Question 59 that Mertz failed to conduct an adequate investigation into his alibi defense and preserve the relevant evidence he claims was available.  This also appears to be the import of Question 92.

During the hearing conducted by the state district court on the petition for postconviction relief, Darby called Mertz as a witness.  In response to questions suggesting that Mertz failed to pursue and preserve evidence relevant to Darby's alibi defense, Mertz testified he hired an investigator to contact Darby's claimed alibi witnesses and the results of the investigation were that Darby had no viable alibi defense.  If anything, according to Mertz, the so-called alibi witnesses put Darby in the vicinity of where the crime took place and the likely impact of their testimony would be inculpatory, not exculpatory.  (Ex. B11, pp. 18-35).

Relying upon this testimony, the district court concluded that Darby failed to prove that Mertz's tactical decision of not further pursuing an alibi defense, which the district court labeled as "fruitless[,]" did not fall below the objective standard of reasonableness for defense counsel.  (Ex.

B15, p. 6). This conclusion is well-supported by the state-court record, including the trial testimony outlined earlier, and was not an objectively unreasonable application of <u>Strickland</u>.

Moreover, Darby took over his defense soon after the preliminary hearing and had adequate opportunity to further pursue his "alibi" defense on his own. In fact, he called two alibi witnesses at trial. Consequently, Darby cannot satisfy the second prong of <u>Strickland</u> requiring that he demonstrate prejudice. <u>See</u> <u>id.</u>

In summary, the claim of ineffectiveness in Questions 59 and 92 for failure to pursue and preserve the alleged alibi evidence fails on the merits.

        **b.**        **Question 19 - failure to appeal the denial of pretrial bail**

Darby complains in Question 19 that Mertz should have appealed the district court's bail orders. (Doc. No. 2). Darby, however, was found guilty, and, as the district court correctly observed in its memorandum opinion, he failed to demonstrate how pretrial release would have affected the outcome of the trial. (Ex. B15, p. 8). In addition, it appears improbable that the North Dakota Supreme Court would have overturned the district court's bail orders, since the bail amount of $25,000 cash or surety was hardly excessive, given the charged offenses and Darby's extensive prior criminal history, and since the amount was set by one district judge and allowed to remain in place by another when Darby moved for a reduction in bail. (Exs. A3; A5; B15, p. 8). This claim of ineffectiveness also fails on the merits.

        **c.**        **Question 31 - alleged abandonment by pretrial counsel**

Darby complained in the state postconviction proceeding that Mertz coerced him into representing himself at trial. While less then clear, Darby may be attempting to repeat the same claim here in Question 31.

The district court concluded, however, there was no coercion, relying upon Mertz's postconviction testimony in which he denied coercing Darby into representing himself. (B15, p. 9). The district court's denial of Darby's ineffective assistance "coercion claim" on this basis is well-supported by the record. (Exs. B11, pp. 83-89; B13, p. 72).

In addition, the district court also denied the claim based on the court's extensive pretrial colloquy with Darby before he was allowed to proceed *pro se*. (Ex. B15, p. 9). And, with respect to this ground, the record reflects that Darby was warned about the pitfalls of proceeding *pro se* and advised that standby counsel would not be appointed. In addition, the record supports the conclusion that Darby's waiver of his right to counsel was knowing, intelligent, and voluntary. (Exs. A19, pp. 4-14; A20-21; B15, p. 9). Consequently, the district court's conclusion that there was no constitutional violation based on its colloquy with Darby is well-supported in terms of the facts. Also, it is not an unreasonable interpretation or application of prior Supreme Court precedent. E.g., Faretta v. California, 422 U.S. 806, 835-36 (1973) (similar colloquy with defendant seeking to proceed *pro se* sufficiently established a voluntary, intelligent, and knowing waiver of right to counsel); McKaskle v. Wiggins, 465 U.S. 168, 183 (1984) (stating that Faretta does not require appointment of standby counsel); see also United States v. Keiser, 578 F.3d 897, 903 (8th Cir. 2009) (discussing fact that the Supreme Court has not recognized a constitutional right to standby counsel); United States v. Armstrong, 554 F.3d 1159, 1165 (8th Cir. 2009) (discussing requirements of a knowing, intelligent, and voluntary waiver of counsel). Consequently, Question 31 fails on the

merits to the extent it incorporates the ineffective assistance "coercion claim" that Darby raised during state postconviction proceeding.[5]

### 4. Questions claiming ineffective assistance of sentencing counsel

Attorney Mottinger represented Darby for the sentencing phase of his criminal proceeding. In his petition here, Darby makes several claims of ineffective assistance by Mottinger.

---

[5] In his state postconviction proceedings, Darby raised several additional complaints with respect to attorney Mertz's performance that were addressed by the district court. However, these complaints are not fairly reflected in any of the 107 "questions" set forth in Darby's petition - at least not with the requisite specificity required under Rule 2 of the Rules Governing § 2254 Cases to make them cognizable here. That being said, the following points are noted:

- Darby complained that Mertz failed to make a number of pretrial motions. With respect to this point, the district court concluded that Darby suffered no prejudice since he had more than sufficient time to bring whatever motions he wanted after Mertz was discharged and he took over his own defense and that, in fact, Darby made a number of motions. (Ex. B15, pp. 6-7). These conclusions are supported by the record and were not an unreasonable application of Strickland. (Exs. A8-A17; B11, pp. 62-63).

- Darby contended that Mertz was ineffective in representing him at the preliminary hearing, claiming he should have subpoenaed the State's witnesses and his alibi witnesses and should have asked certain questions and made other points. The district court rejected these arguments on several grounds. The court observed with respect to the witnesses that Darby claimed should have been called that he failed to present any evidence that their testimony would have been helpful in demonstrating lack of probable cause and that, in fact, most of the witnesses testified at trial and were able to convince a jury of Darby's guilt beyond a reasonable doubt. Further, the court observed that Mertz had a tactical reason for not calling the restaurant employees who would later testify at trial that Darby was the perpetrator. The reason, as expressed by Mertz during his testimony, was that calling the restaurant employees to testify would have given them an additional opportunity to see Darby and solidify their identification of him prior to trial. Finally, as for Mertz's alleged failure to ask certain questions and raise other points, the district court concluded that these were all tactical decisions that were not objectively unreasonable. With respect to all of these points, the district court's conclusions were a reasonable application of Strickland. Further, Darby failed to demonstrate how any of these alleged acts of ineffective assistance during the preliminary hearing prejudiced him in terms of the trial where the jury found him guilty. (Ex. B15, pp. 7-8).

- Darby also complained that Mertz failed to obtain recordings or transcripts of conversations that he had at the Cass County jail. However, according to Mertz, he investigated this issue and uncovered no such recordings or transcripts, and the district court concluded he was not ineffective in failing to obtain evidence that did not exist. While that conclusion is also not an unreasonable application of Strickland, Darby also failed to demonstrate how the failure to obtain information related to an alleged monitoring of his calls at the jail caused him prejudice, particularly since the district court concluded there was no indication that attorney-client privileged calls were being monitored. (Ex. B15, p. 8).

- Darby complained that Mertz was ineffective in not advising him of a fourteen-day deadline for demanding a speedy trial. The district court held there was no such requirement under state law. (Ex. B15, pp. 5-6). In addition, Darby failed to demonstrate any prejudice.

### a. Question 54 - alleged ineffectiveness in calling witness at sentencing

Darby claims in Question 54 that Mottinger was ineffective in calling witness Barb Brieland to testify during his sentencing hearing. In order to understand this claim, some background is required.

One of Darby's strategies at sentencing was an attempt to persuade the court to give him either probation combined with treatment for cognitive restructuring or a short amount of time to be served with the rest of the sentence to be suspended if he successfully completed a term of probation with treatment. This strategy proved to be unsuccessful, however, when the district court sentenced Darby to ten-years imprisonment on the burglary conviction.

At sentencing, Mottinger first called Dr. Benson. She had conducted a postconviction psychological evaluation of Darby and diagnosed him as having an antisocial personality disorder. Dr. Benson testified that "cognitive restructuring" is a form of treatment that is sometimes used to treat antisocial personality disorder and that this form of treatment was available at Centre, Inc., a local halfway house. Under cross-examination, Dr. Benson testified to her belief that this treatment was similarly available at the North Dakota State Penitentiary and had so indicated in her report. (Ex. A47, pp. 8-19).

Attorney Mottinger then called Barb Brieland to testify. Brieland was employed by the North Dakota Department of Corrections and Rehabilitation ("NDDOCR") and had knowledge regarding the treatment afforded at the penitentiary. Mottinger testified during the postconviction hearing that the reason why he called Brieland was to counter Dr. Benson's testimony under cross-examination and establish that the cognitive restructuring offered at the penitentiary was only for

convicted sex offenders or those with a chemical dependency and not for those suffering from antisocial personality disorder like Darby.  After eliciting testimony to that effect, Mottinger then asked Brieland whether Centre, Inc. offered cognitive-restructuring treatment, and she said no.  She testified that, while Centre, Inc. had a program that similarly focused upon reality or logic, it was not as extensive as the penitentiary's and involved only four sessions, for a total of six hours.  (Ex. A47, pp.24-30).

Darby claims in Question 54 that Mottinger's calling Brieland to testify torpedoed his chances of probation or a short sentence coupled with cognitive-restructuring treatment at Centre, Inc., and resulted in a lengthy prison sentence, instead.  The district court dispensed with this claim by concluding that Brieland's testimony supported Darby's sentencing strategy, notwithstanding her comments about Centre, Inc.'s program, because it established the lack of cognitive-restructuring treatment at the NDSP for a person in Darby's situation and that Mottinger calling her to testify was "an example of good lawyering, not ineffective assistance of counsel."  (Ex. B15, p. 10).  The record as cited above supports this conclusion.

In addition, Darby has failed to demonstrate here that he suffered any prejudice.  In particular, he ignores Dr. Benson's other testimony, which was that there is no guarantee that cognitive-restructuring treatment would be effective in Darby's case and that there is not good evidence supporting what is effective for treatment of antisocial personality disorder.  In fact, her testimony was that  antisocial personality disorder is usually addressed with containment, harm reduction, and legal consequences.  (Ex. A47, pp. 12-13).  Morever, the district court made it very clear when sentencing Darby that his lengthy sentence of imprisonment was based in large part upon his extensive prior criminal history.  In fact, the court read into the record Darby's history of some

35

twenty-four prior convictions, which were mostly for theft, burglary, and firearms offenses, and told Darby he was lucky the State had not sought to have him sentenced as habitual offender because that would have resulted in a sentence that would have been double what he received. (Ex. A47, pp.52-62). In short, there is no indication that Darby's sentence would have been one day less if Mottinger had not called Brieland as a witness or asked her about Centre, Inc.'s treatment modality.

In summary, the district court's denial of this claim of ineffective assistance of sentencing counsel was not an unreasonable application of Strickland and fails on the merits.

### b. Question 62 - failure to attend PSI interview

Darby claims in Question 62, as he did during his state postconviction proceeding, that Mottinger was ineffective in not attending his presentence interview, which was conducted by officers of the Parole and Probation Division of the NDDOCR and used by the court at the time of sentencing. During the postconviction hearing, Mottinger testified that the standard practice of state criminal defense counsel in North Dakota is not to attend PSI interviews conducted by the NDDOCR. (Ex. B13, pp. 78-80). Based on this testimony and the lack of any evidence presented by Darby to the contrary, the district court concluded that Darby had failed to establish that Mottinger's non-attendance fell below an objective standard of reasonableness. (Ex. B15, p. 9). Further, the district court also concluded that Darby had failed to demonstrate any prejudice. These conclusions are supported by the state record and are not an unreasonable application of Strickland. (Exs. A47; B13, pp. 78-80; B15, p. 9). Consequently, this claim fails on the merits.

### c.     Questions 83 & 99 - failure to present allegedly helpful evidence at sentencing and to argue for probation sentence

Darby argued during his postconviction proceedings that Mottinger was ineffective in not calling certain witnesses to testify during his sentencing hearing and in not arguing for straight probation with treatment. The state district court dismissed both of the arguments based on Mottinger's testimony that he had interviewed the witnesses that Darby suggested should have been called, determined they would not be helpful, and believed an argument for a short jail sentence followed by treatment had more of a chance of success than arguing for straight probation. In addition, the state district court concluded Darby had failed to demonstrate prejudice resulting from the failure to call his sentencing witnesses in that he had failed to establish what the testimony of these witnesses would have been, either by calling them as witnesses during the postconviction hearing or offering affidavit testimony, neither of which Darby did. (Ex. B15, p. 11).

These conclusions likewise are supported by the state record (Ex. B13, pp. 100-106, 116-122) and are not an unreasonable application of <u>Strickland</u>. Morever, as indicated above, it is clear from the remarks made by the district court at the time of sentencing that Darby's ten-year prison sentence was driven primarily by his extensive prior criminal record.

Consequently, this claim also fails on the merits.

### 5.     Questions 60 & 84 - ineffective assistance of appellate counsel

Darby alleges in Question 60 that his appellate counsel, Attorney Ogren, was ineffective in failing to raise additional points of appeal. However, Darby does not list what points should have been raised, either within Question 60 or that part of the petition where he argues the merits of question. (Doc. No 2, pp. xvii & 53). Consequently, Darby has failed to state a proper claim with

respect to Attorney Ogren's performance.[6]  Rules Governing § 2254 Cases 2(c); <u>see</u> <u>Mayle v. Felix</u>, 545 U.S. 644, 655-56 (2005); <u>Simms v. Carroll</u>, 432 F. Supp. 2d 443, 444-45 (D. Del. 2006).

Question 84 is virtually incomprehensible, but appears to be directed to the efforts of Attorney Pulkrabek, who was the first attorney appointed to represent Darby on direct appeal.  The district court  in its memorandum opinion denied any claim of ineffectiveness on the part of Pulkrabek based on Darby's failure to demonstrate prejudice, given that Pulkrabek's representation

---

[6]  The district court denied Darby's claim of ineffective assistance with respect to Attorney Ogren for lack of evidence.  The court based this conclusion upon Darby's failure to call Ogren to testify at the postconviction hearing, (even though he had subpoenaed him to appear) or to offer any of the numerous documents that Darby had submitted with his petition as exhibits.  (Ex. B15, p. 12).  These reasons may be open to question, however.  There is no state rule requiring that Darby call his appellate counsel to testify in order to establish ineffective assistance.  Also, for some of the claims, additional record evidence (documentary or otherwise) may not have been needed - particularly those that the district court had already ruled on pretrial and made findings of fact.  Finally, Darby's failure to formally offer the documents accompanying his petition as exhibits might be viewed as a hyper-technical application of any evidentiary requirements, particularly for documents that were transcripts of pretrial proceedings or copies of pretrial orders and other court documents, over which there could be no reasonable objection as to authenticity.  On the other hand, the state postconviction proceeding is a separate civil action that does not automatically incorporate the records from the criminal proceeding.  For example, the North Dakota Supreme Court in <u>State v. Steen</u>, 2004 ND 228, ¶ 20, 690 N.W.2d 239, denied claims of ineffective assistance of trial counsel for failure to demonstrate prejudice because the petitioner had failed to file the trial transcript with the postconviction court, even though the judge considering the petition had presided over the criminal trial and, in the related § 2254 case, the Eighth Circuit upheld this failure to demonstrate prejudice as not being an unreasonable application of clearly established federal law.  <u>Steen v. Schmalenberger</u>, 687 F.3d 1060, 1064 (8th Cir. 2012).

The court need not grapple with these difficult questions given Darby's failure to properly set forth in his § 2254 petition here his claims of ineffective assistance with respect to Attorney Ogren.  While Darby may contend this will result in meritorious claims not being adjudicated, that is improbable.  Many of the claims that Darby likely would contend should have been asserted by Ogren on direct appeal appear to have been argued by Darby as "direct claims" in his later postconviction appeal and most of these claims are addressed on the merits later herein.  Further, with respect to what may be the rest, Darby has failed to demonstrate how the failure to raise the claims would have changed the outcome in light of the overwhelming evidence of his guilt and/or his own failure to preserve for appeal points of error when he represented himself for much of the pretrial proceedings and at trial.  With respect to the latter, the Eighth Circuit has recently explained:

"To preserve an error for appellate review, an objection must be timely and must clearly state the grounds for the objection." <u>United States v. Pirani</u>, 406 F.3d 543, 549 (8th Cir.) (en banc), cert. denied, 546 U.S. 909 (2005). Given the lack of a clear objection, we must assume appellate counsel knew that, unlike in <u>Thunder</u>, our review of a public trial claim on direct appeal would be for plain error. This virtually forecloses Charboneau's claim of deficient appellate performance. As we explained in <u>Roe v. Delo</u>, 160 F.3d 416, 418 (8th Cir. 1998):  "The decision to forgo a plain error claim is usually the result of a reasonable winnowing of weaker appellate claims.  Therefore, we rarely conclude that an appellate attorney's performance was constitutionally deficient for not raising such a claim."

<u>Charboneau v. United States</u>, No. 11-3511, 2013 WL 133190, at *4 (8th Cir. Jan. 11, 2013).

was terminated and the brief that he submitted was withdrawn.  (Ex. B15, pp. 12-13).  Obviously, this was not an unreasonable application of <u>Strickland</u>, and this claim fails on the merits.

**F.**     **<u>"Direct claims" of constitutional violation not raised during the direct appeal</u>**

**1.     Introduction**

In Questions 1-14, 17-18, 23-24, 28-29, 32, 44-48, 51-53, 55, 57-58, 61, 63-72, 74-78, 82, 90-91, 100-101, and 104-107, Darby attempts to raise a number of "direct claims" of constitutional violation that could have been included in his direct appeal to the North Dakota Supreme Court, but were not.  It appears Darby attempted to raise a number of these claims during his postconviction proceedings.  To the extent he did so and the state courts arguably considered the claims on the merits, the claims will be considered here.  The remainder, however, need not be addressed because they have been procedurally defaulted.  Before turning to the individual claims, a more detailed discussion of these points is required, beginning with what happened to the "direct claims" now under discussion during the state postconviction proceeding and on appeal and what deference must be accorded the state-court decisions.

**2.     Background and recommended handling  of "direct claims" arguably raised during the state postconviction proceedings and appeal**

As already mentioned, there is some question whether Darby set forth "direct claims" of constitutional violation in his rambling, several-hundred-page state petition for postconviction relief and supplement in addition to his claims of ineffective assistance of counsel.  (Exs. B3-B6, B8).  One way to read Darby's petition is that his arguments about direct constitutional violations were intended only to be an explanation for why his appellate counsel was ineffective in not raising them on direct appeal.  Another way to read the petition, however, is that Darby was raising separate

"direct claims" of constitutional violations, along with arguments as to why he should be excused from not having raised them earlier.

In its memorandum opinion dismissing Darby's petition, it appears the district court adopted the latter interpretation. This is because, after discussing Darby's ineffective-assistance claims, the court went on to state that other "miscellaneous claims" failed for lack of evidence. The court did not specify exactly what these claims were, describing them only as allegations of prosecutor and court wrongdoing and other "odd issues that might be gleaned from Mr. Darby's Petition[.]" (Ex. B15, p. 12).

What is also notable about the district court's decision is that the court did not dismiss the "miscellaneous claims" based on procedural grounds or the affirmative defense of misuse of process under N.D.C.C. § 29-32.1-12(2). And, one reason for the latter may have been failure of the State to raise misuse of process as a defense, either in its answer to Darby's petition or later during the postconviction hearing. (Exs. B9, B12-B14).

On postconviction appeal, almost all of the issues raised by Darby in his *pro se* briefing, at least on their face, appear to be direct claims of constitutional violations, most of which could have been raised in the direct appeal. (Ex. B19). It was not until page 35 of his 42-page opening brief that Darby addressed claims other than what appears to be these "direct claims." While that appears to be the most reasonable reading of Darby's *pro se* briefing, it might be possible to read the discussion of his direct points of error as merely a prelude to an argument as to why his appellate counsel was ineffective in not raising them.

As discussed earlier, the State in its response spent most of its brief arguing the claims of ineffective assistance that Darby raised in the proceedings below, even though there is some

question whether Darby's brief addressed any of these claims. (Ex. B21). Notably, however, the State did argue that the "other claims" raised by Darby were properly dismissed by the district court for lack of evidence - without stating what the claims were or why the evidence was lacking. Also, the State did not argue misuse of process for not having raised the "other claims" on direct appeal and concedes in its briefing here this was the case. (Ex. B21, ¶¶ 36-37; Doc. No. 18, p. 47).

The North Dakota Supreme Court summarily affirmed the district court's denial of Darby's petition in one sentence, referencing only claims of ineffective assistance of counsel. The court stated:

> [¶ 1] Vonnie D. Darby appealed from a trial court amended order denying his application for post-conviction relief. On appeal, Darby argues the trial court erred in concluding he did not receive ineffective assistance of counsel. We affirm under N.D.R.App.P. 35.1(a)(2).

State v. Darby, 2010 ND 180.

In light of the record of what was before the North Dakota Supreme Court, the reference in its summary dismissal to only claims of ineffective assistance of counsel leaves this court in a quandary with respect to exactly what was decided. The possibilities include the following:

- The court intended to affirm the denial of all of Darby's claims for the reasons articulated by the district court, including the non-ineffective-assistance claims addressed by the district court. However, this seems unlikely, given the court's characterization of Darby's arguments on appeal as being ones of ineffective assistance of counsel. Notably, the State in its briefing here appears to agree and

reads the court's decision as addressing only ineffective-assistance claims. (Doc. No. 18, p. 35).

- The court construed Darby's petition and brief as raising only ineffective-assistance claims. While this might be more plausible, it too is uncertain, given: (1) the apparent contrary reading given to Darby's petition by the state district court and the State in the postconviction proceedings and upon appeal; (2) the arguably plain language of Darby's postconviction appeal brief; and (3) the State's assessment of the situation in its briefing here.

- The court concluded that the non-ineffective-assistance claims were not properly before the court because they had not been properly presented to the district court in the rambling, several-hundred-page petition. However, the court did not state this as a reason for addressing only ineffective-assistance claims.

- The court concluded that any non-ineffective-assistance claims were barred on account of misuse of process because they were not raised in Darby's earlier direct appeal. However, the court did not state that, and the court has previously held that misuse of process is an affirmative defense that must be asserted by the State. Voisine v. State, 2008 ND 91, ¶ 9, 748 N.W.2d 429.

- The court simply overlooked the non-ineffective-assistance claims. This too seems doubtful given Darby's briefing and the district court's decision.

In sorting through the possibilities, it appears clear this court cannot conclude that any non-ineffective-assistance claims presented to the North Dakota Supreme Court are barred from consideration here based on their having been disposed of on independent state law grounds, such as misuse of process or lack of proper presentation. This is because "a federal claimant's procedural default precludes federal habeas review . . . only if the last state court rendering a judgment in the case rests its judgment on the procedural default." Harris v. Reed, 489 U.S. at 262. And here, it is not sufficiently clear that the North Dakota Supreme Court rested any part of its decision upon independent state law grounds for this court to conclude that the claims are barred from federal habeas review. See id. at 264-66; Harrington, 131 S.Ct. at 784-85 (there is a presumption that the state court's decision was on the merits for any federal constitutional claims presented when the basis for the decision is unclear); cf. Coleman v. Thompson, supra.

As for the possibility that Darby's postconviction appellate brief presented direct, non-ineffective-assistance claims, as opposed to simply arguments for why his appellate counsel was ineffective in failing to make them, the most prudent course of action is to assume that it did and address the claims on the merits to the extent that Darby has raised the same claims in his petition here, given that the claims are easily disposed of on the merits. Arguably, this is what would be required in any event, given the plain language of Darby's postconviction appellate brief, the district court's decision, and the State's reading of the North Dakota Supreme Court's decision in its briefing here.

Before turning to the individual claims, it is necessary first to discuss the scope of review. Under 28 U.S.C. § 2254(d), "AEDPA deference" only applies when the state court's adjudication is on the merits. E.g., Harrington, 131 S. Ct. at 784. In this case, if the North Dakota Supreme Court

had simply affirmed the district court's denial of Darby's petition for postconviction relief without saying anything further, the court would be required to apply AEDPA deference. This is because "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-85. The presumption of adjudication on the merits, however, "may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785. This appears to be the case here, given the North Dakota Supreme Court's characterization of Darby's claims as one of ineffective assistance of counsel and the other possibilities of non-merits disposition discussed above, which collectively are more likely. Consequently, to eliminate any argument, the non-ineffective-assistance claims arguably raised in Darby's postconviction appellate brief and repeated again in Darby's petition here will be considered under the pre-AEDPA standard of review, which is *de novo* with respect to questions of law or mixed questions of law and fact and clear error with respect to factual findings. Brown v. Allen, 344 U.S. 443 (1953); Williams v. Taylor, 529 U.S. 362, 400-402 (2000) (O'Connor, J., concurring); Canaan v. McBride, 395 F.3d 376, 383 (7th Cir. 2005); Clemons v. Luebbers, 381 F.3d 744, 756 n.8 (8th Cir. 2004); Taylor v. Bowersox, 329 F.3d 963, 967-68 (8th Cir. 2003); Robinson v. Crist, 278 F.3d 862, 865 (8th Cir. 2002) (citing Washington v. Schriver, 255 F.3d 45, 55 (2d Cir. 2001)); Appel v. Horn, 250 F.3d 203, 211-12 (3d Cir. 2001).

### 3.　"Direct claims" that Darby arguably included in his state postconviction appellate brief and raises in his § 2254 petition here

#### a.　Questions 1, 4-5, & 8-13 - violations of constitutional rights resulting from impermissibly suggestive eyewitness identifications

Darby argued in his postconviction appellate brief that his constitutional rights had been violated because the police, and later the prosecutors, had employed impermissibly suggestive procedures in securing or reinforcing the eyewitness identification evidence. (Ex. B19, pp. i-iv, 6-22). In particular, Darby challenged the "one person showup" and "one person photo display" used with respect to witness Delagarza. He argued that these procedures were impermissibly suggestive, particularly when accompanied by what he claimed were suggestive verbal comments by the police that they had detained the burglar and Darby being surrounded by police officers. In his petition here, Darby raises essentially the same claim in all or parts of Questions 1, 4-5, and 8-13.

Prior to trial, Darby moved to suppress Delagarza's testimony on these grounds, and the district court denied the motion. The district court concluded that, while the "showup" and "one person photo display" shown to Delagarza were suggestive, they were not impermissibly so, since they were conducted a very short time after the crime was committed and while police were still in the process of deciding whether Darby was the likely perpetrator or whether they should move on and look for others. In the alternative, the district court also concluded that Delagarza's identification of Darby was reliable under the totality of the circumstances given the fact that Delagarza got a good look at Darby, the accuracy of his description, and the short time period between the commission of the offense and the showup. (Exs. A34, pp. 22-25; A35, pp. 6-7). In reaching the conclusion that there was no constitutional violation for these alternative reasons, the

district court relied upon the North Dakota Supreme Court's decision in State v. Norrid, 2000 ND

112, 611 N.W.2d 866, which, in turn, relied upon the Eighth Circuit's decision in United States v.

King, 148 F.3d 968 (8th Cir. 1998) and the following United States Supreme Court cases: Manson

v. Brathwaite, 432 U.S. 98 (1977); Neil v. Biggers, 409 U.S. 188 (1972); Stovall v. Denno, 388 U.S.

293 (1967); and Simmons v. United States, 390 U.S. 377 (1968).

The legal conclusions reached by the district court as set forth above are well-supported by

the above precedent, and the facts relied upon by the district court are supported not only by the

evidence presented at the preliminary hearing (Ex. A19), but also the trial evidence as outlined

earlier. In short, even under a pre-AEDPA standard of review, Darby's claim that the "showup" and

"one person photo" display violated his Due Process rights fails on the merits.

Darby also claimed that the prosecutor showed the restaurant witnesses a single photo of

Darby during witness preparations shortly before trial and that this was impermissibly suggestive

and tainted their later in-court trial identifications. However, the only evidence that appears in the

record that a witness was shown a photo during witness preparation was Delagarza. He testified

during trial that the prosecutor had shown him a photograph shortly before trial. (Tr. Tr. 184). But,

by that point, Delagarza had already identified Darby the morning of the burglary both during the

showup and the display of his driver's license. Consequently, it is doubtful that the latter display

of the photograph shortly before trial was impermissibly suggestive. Moreover, Delagarza's in-court

identification was simply cumulative of the police officer testimony that Delagarza had positively

identified Darby on the morning of the burglary. Hence, even if his in-court identification was

impermissibly tainted and wrongfully admitted, the error was harmless given the evidence of his

contemporaneous identification and the other overwhelming evidence of Darby's guilt as outlined

earlier, including the damning circumstantial evidence.  See Gilbert v. California, 388 U.S. 263, 272 (1967) (state would be permitted to show that the admission of tainted eyewitness identification testimony was harmless error); English v. Cody, 241 F.3d 1279, 1284-85 (10th Cir. 2001) (applying harmless error analysis with respect to allegedly impermissibly suggestive photographic lineup); Garcia v. Evans, No. CV 07-02316, 2009 WL 3416501, at *5 (E.D. Cal. Oct. 23, 2009).

Darby suggests the two other restaurant employees were similarly shown a photograph during their witness preparations.  However, this is mere speculation.  Unlike Delagarza, no testimony was elicited during trial that the other two employees were shown a photograph (Tr. Tr. 228-306), and Darby has not pointed to any other evidence proving this occurred.  Further, even if the two witnesses had been shown a photograph and even if their in-court identifications had been impermissibly tainted as a result, the error would have been harmless given the other overwhelming evidence against Darby.

**b.**     **Questions 1-3 & 64-65 - conducting the "showup" and "one person photo display" without counsel being present**

Darby appears to argue in his postconviction appellate brief that police violated his constitutional right to counsel when they conducted the "showup" and used the "one person photo display" with witness Delagarza without Darby having counsel present.  (Ex. B19, pp. 6-16).  He repeats the same argument here in all or parts of Questions 1-3 and 64-65.

These arguments also fail on the merits.  At the time of the "showup," Darby had not yet been charged.  In Kirby v. Illinois, 406 U.S. 682 (1972), the Supreme Court concluded that the right to counsel does not attach until formal charges are lodged and that there is no right to counsel during an in-person identification that occurs prior to that time.  In addition, the Supreme Court held in

<u>United States v. Ash</u>, 413 U.S. 300 (1973) that there is no right to counsel when police show photographs of a suspect regardless of when that occurs.

Darby argues, nevertheless, that the "showup" and "one person photo displays" violated his rights as enunciated in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). However, <u>Miranda</u> addresses only the right against self-incrimination under the Fifth Amendment and has nothing to do with whether there is a right to counsel at a showup or exhibition of a photograph display or whether those procedures are impermissibly suggestive. In addition, the exhibition of a suspect does not invoke Fifth Amendment rights against self-incrimination because it does not involve the giving of evidence having testimonial significance. <u>United States v. Wade</u>, 388 U.S. 218, 222-23 (1967).

        **c.**        **Question 14 - failure to conceal his physical appearance at preliminary hearing and to provide for voice identification procedures**

Darby argued in his postconviction appeal that the trial court erred in not granting his requests prior to the preliminary hearing to conceal his physical appearance from the eyewitnesses and to arrange for a voice identification procedure for the witnesses. (Ex. B19, pp. ii, 16). Darby has failed to cite to any authority, however, that this was required. Moreover, the only witness who testified at the preliminary hearing was Detective Cruff. Consequently, no possible constitutional violation occurred, and this claim fails on the merits.

        **d.**        **Questions 90-91 - <u>Brady</u> violations**

Darby argued as a separate point in his postconviction appeal that the State violated its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), to turn over exculpatory evidence by its

alleged failure to produce a video from a Stop-N-Go convenience store.[7] In Questions 90-91, Darby alleges that the State committed <u>Brady</u> violations, but is not specific as to what the alleged violations were. Consequently, Questions 90-91 fail to properly state a claim as required by Rule 2 of the Rules Governing § 2254 Cases and need not be considered further.[8]

### e.      Questions 63, 67, & 74 - sufficiency of the evidence

Darby contended in his postconviction appeal brief that the evidence was insufficient to convict him. It appears Darby is making the same claim here in Question 63 and, perhaps, indirectly in Questions 67 and 74.

The merits of Darby's sufficiency of the evidence claim are governed by <u>Jackson v. Virgina</u>, 443 U.S. 307 (1979). The relevant inquiry under <u>Jackson</u> is whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after considering the evidence in the light most favorable to the state court judgment, including all reasonable inferences. <u>Id.</u> at 318-19.

An extended discussion of this point is not required. For not only is the <u>Jackson</u> standard easily met in this case, the evidence against Darby was overwhelming, particularly when considering the circumstantial evidence outlined earlier.

---

[7] Police learned from the Stop-N-Go manager that a black male was in the store at approximately 7:45 a.m. on the morning of the burglary. The black individual, who was wearing clothing matching what Darby was wearing when he was detained, had asked for an employment application. The Stop-N-Go video showed the black individual, but its quality was not sufficient to determine if it was Darby. Given that the Stop-N-Go store was less than a mile from the Chicago Uno Grill, Darby's presence there, assuming it was him, did not foreclose him from having committed the burglary later. All of this was testified to at the preliminary hearing. (Ex. A19, pp. 24-26).

[8] Even if Darby's petition properly raises the Stop-N-Go video claim, it would fail. During the postconviction hearing, Darby questioned Attorney Mertz as to why he had not obtained a copy of the video when the prosecutor advised in an email that the video had been found and was available for him to pick up. (Ex. B13, pp. 61-63). Thus, from the record evidence that is available, the video was made available to the defense.

### f. Question 32 - failure to name a natural person as the victim in the charging document

Darby also argued in his state postconviction appeal that his constitutional rights embodied in the "Due Process, Confrontation, and Fair Trial Clauses" were violated by the district court's failure to dismiss his prosecution because the charging document failed to name a natural person as the victim. (Ex. B19, pp. 34-35). Darby contended that the name of the victim was required by N.D.C.C. § 29-05-01(5), which provides that a complaint must state: "The person against whom, or against whose property, the offense was committed, if known[.]" Darby attempts to make the same claim here in Question 32.

Darby has failed to demonstrate, however, how a violation of this state-law requirement, assuming it applied, would violate any of the federal constitutional rights that he has alleged, particularly, since it is clear from the underlying record that Darby was well aware of the basis for the charges brought against him. Further, the state statute that Darby references applies only to complaints. In this case, the final charging document was an Information. Moreover, the Information does make reference to both the Chicago Uno Grill and Ciro Delagarza. (Ex. A2). This claim fails on the merits.

### g. Question 101 - prejudicial final argument

Darby further argued in his postconviction appeal brief that the State violated his rights when the prosecutor allegedly made false and prejudicial statements during final argument. (Ex. B19, pp. 33-34). Darby raises the same claims here in Question 101.

Darby contended in his postconviction appeal brief and here in Question 101 that the prosecutor improperly commented on the fact that he did not take the stand in violation of his Fifth

Amendment rights by allegedly making the following statement: "*Mr. Darby* also told you that after the defendant got the application and left he re-entered the business[.]" (Doc. No. 2, p. xxv; Ex. B19, p. 34) (italics added). However, a review of the trial transcript indicates that the prosecutor's actual statement was: "*Mr. Delagarza* also told you that after the defendant got the application and left he re-entered the business[.]" (Ex. A43, p. 525) (italics added).

Darby also claimed in his postconviction appeal brief that the prosecutor made the statement that:

> "all" the witnesses called by the State indicates that this did occur" . . . "every witness told you that's where "it" happened."

(Ex. B19, p. 33) (errors in original). A similar purported quote from the prosecutor's closing argument is set forth in Darby's petition here. (Doc. No. 2, p. 51). Darby attempted to argue in his postconviction appeal brief, and slightly differently in his petition here, that this statement was false because not every witness was able to testify with firsthand knowledge about the details of the evidence against him. (Ex. B19, p. 22; Doc. No. 2, pp. 50-51). However, Darby again mischaracterized the prosecutor's statements. What the prosecutor actually stated was the following:

> Well, let's start out with the testimony of all of the witnesses called by the State indicates this did occur on October 2, 2006. There was testimony also that it happened at Uno's Chicago Grill and I believe every witness told you that's where it happened.

(Ex. A43, p. 524).

Darby also contended in his postconviction appeal brief that the prosecutor prejudicially argued that Darby had no alibi defense because neither of his alibi witnesses could say he was in Kroll's Diner on October 2, 2006, and neither of them could say it was during the time that the crime was committed. Darby contends this argument was false. A review of the transcript indicates that

Darby did not object to this argument when it occurred. (Ex. A43, p. 526). Further, the prosecutor's statement was within the bounds of fair argument. As outlined previously, neither witness was able to testify with certainty as to the day Darby was in Kroll's Diner much less the precise time that he was there.

Finally, Darby in his petition here attempts to make additional points for why the prosecutor's argument was prejudicial. These need not be examined in detail because the arguments were not made in his postconviction appeal brief; hence, they clearly have not been properly exhausted and have now been procedurally defaulted. But, even if that was put aside, the other points of argument that Darby claims were prejudicial were within the realm of fair argument.

In summary, Darby's claim of prosecutorial misconduct during final argument fails on the merits.

**4.    "Direct claims" not included in either Darby's direct appeal brief or his postconviction appeal brief  - Questions 6-7, 17-18, 23-24, 28-29, 44-48, 51-53, 55, 57-58, 61, 66, 68-72, 75-78, 82, 100, & 104-107**

There are a number of "direct claims" that Darby attempts to make now that he failed to present either on direct appeal or in the appeal from the district court's denial of his petition for postconviction relief. These include Questions:  6-7 and 104 (whether the standard <u>Miranda</u> warnings are misleading and deprive a suspect of other purported rights); 17, 23, and 46-48 (refusal to appoint standby counsel); 18 (alleged failure to inform Darby as a *pro se* defendant he had the right to take the stand and ask questions of himself); 24 (vagueness of the burglary statute); 28-29 (monitoring of jailhouse calls prior to and during trial); 44-45 (allowing the State to have a representative at counsel table); 51 (denial of request for certain witness subpoenas); 52-53 (alleged improper weighing of sentencing evidence); 55 (allowance of testimony from witnesses not named

in charging document); 57 (failure of law enforcement to obtain and preserve fingerprint evidence); 58 (failure to give a lesser-included instruction for theft); 61, 69 and 75-78 (alleged deficiencies in the jury instructions); 66 and 71 (alleged erroneous evidentiary rulings); 68 and 72 (refusal to grant a request for an eyewitness identification expert); 70 (failure of investigating officers to note the time of arrest in their reports); 82 (alleged error in sentencing); 100 (allegedly prejudicial "vouching" remarks by prosecutor during argument); 105 (allowing law enforcement officers to testify in uniform); 106 (court procedure); and 107 (unspecified errors of prosecutorial, law enforcement, and court misconduct).

Because of the failure to present these claims to the North Dakota Supreme Court in either the direct or postconviction appeals, the claims have not been properly exhausted under the authority cited earlier. And, more fundamentally, the claims have now been procedurally defaulted given the state-law statutory bars of res judicata and misuse of process, which the State in its briefing invokes now and inevitably would raise if Darby returned to state court.

### G. Other "questions"

#### 1. Questions 79-81, 85-88, & 95-96 challenging the fairness of the state postconviction process

In several of Darby's "questions," he attempts to raise claims regarding the fairness of his state postconviction process. In Questions 85, 88, and 95-96, Darby contends that the state district court unduly delayed resolution of his postconviction relief proceedings and should have used state habeas procedures, which Darby claims provide for faster process. In Question 86 he claims the state district court took into account testimony from Attorney Mertz that Darby had admitted committing the burglary despite an alleged assurance by the court it would not use the testimony.

In Questions 79-81, he argues that the district court failed to properly consider the documentary evidence that he submitted with his state petition for postconviction relief with respect to his claims of ineffectiveness of appellate counsel and that the court erroneously denied the claims on the grounds that he failed to call his appellate counsel to testify. Finally, Darby appears to contend in Question 87 that the district court erred in not appointing him a third attorney to represent him during the postconviction hearing and in failing to advise him of the pitfalls of proceeding without an attorney. The first opportunity that Darby had to raise these claims was in his appeal from the denial of his petition for postconviction relief and his appellate brief does discuss points that correspond to several of the claims he attempts to raise here. (Ex. B19, pp. 40-42).

The short answer to all of these claims is that Darby has no federal constitutional right to state postconviction process. See Murray v. Giarratano, 492 U.S. 1, 10 (1989); Pennsylvania v. Finley, 481 U.S. 551, 556-57 (1987); cf. Coleman v. Thompson, 501 U.S. 722, 752 (1991) (no right to postconviction counsel). Hence, Darby has no right to federal habeas relief for any deficiencies in that process. See, e.g., Lahay v. Armontrout, 923 F.2d 578, 579 (8th Cir. 1991). The deficiencies, if any, affect only the degree of deference that must be accorded to the state proceedings. Id.

2. **Questions that clearly do not raise a claim of federal constitutional violation relevant to Darby's conviction - Questions 15-16, 20, 33-43, 49-50, 73, 89, 93-94, 97-98, & 102-103**

Questions 15-16, 20, 33-43, 49-50, 73, 89, 93-94, 97-98, and 102-103 are: (1) arguments for lack of exhaustion or a particular remedy; (2) comments on the fairness of various laws, procedures, or exhaustion requirements; or (3) simply unintelligible. Even under the most generous

construction of Darby's petition, they do not raise claims of federal constitutional violations relevant to Darby's conviction. Hence, they need not be considered further.

## H.    Excuses for procedural default

As indicated earlier, the only exceptions to the rules governing procedural default are the rare instances when a petitioner is able to meet the strict "cause and prejudice" or "actual innocence" standards. E.g., Arnold v. Dormire, 675 F.3d at 1087; Dretke v. Haley, 541 U.S. at 392-93 .

Darby's claims of ineffective assistance of appellate counsel have already been addressed along with any claim that his proceeding *pro se* should excuse him from having to comply with state procedures. Apart from that, Darby also contends that page limitations imposed by the North Dakota Supreme Court limited his ability to raise and properly exhaust a number of his claims.

Page limitations on appellate briefs will normally not provide cause for a procedural default. See, e.g., Seymour v. Walker, 224 F.3d 542, 551 (6th Cir. 2000) (concluding that the existence of a page limit on state court appellate briefs did not excuse a procedural default); Weeks v. Angelone, 176 F.3d 249, 271-72 (4th Cir. 1999); Barnes v. Dretke, No. 7:03-CV-081-R, 2006 WL 229015, at * 3 (N.D. Tex. Jan. 31, 2006). The Fourth Circuit's holding in Weeks v. Angelone, 176 F.3d at 271-72, is particularly instructive. There, a petitioner appealed the district court's finding that he had procedurally defaulted his claims because he had failed to brief them on direct appeal. The petitioner claimed that a Virginia rule imposing page limitations had prevented consideration of ten of his claims and that his failure to brief the claims should be excused because the rule did not constitute an adequate, independent state procedural bar. Id. In the alternative, he asserted that he had shown cause and prejudice to overcome the procedural default. Id. The Fourth Circuit flatly rejected both assertions, reasoning:

The fifty-page limit merely limited the manner in which [the petitioner] could present his arguments; it did not wholly prevent him from presenting them. Moreover, the Supreme Court of Virginia has regularly and consistently refused to consider claims not briefed or argued on direct appeal. . . . The state procedural rule that deems arguments not briefed to be waived is therefore an adequate and independent state bar.

\* \* \*

It would be nonsensical to hold that the fifty-page limit, which is itself a reasonable and consistently applied state procedural rule, could constitute cause for failure to adhere to another state procedural rule that deems issues not briefed on direct appeal to be waived. The fifty-page limit therefore did not constitute cause for [the petitioner's] failure to comply with the state procedural rule requiring litigants to brief issues on appeal in order to preserve them.

Id.

In this case, the appellate brief in which Darby should have made most of the arguments that are now foreclosed was his direct appeal brief. But, as Darby points out in Question 60 in which he claims insufficiency of his appellate counsel, his direct appellate brief did not come anywhere close to his page or word limit. (Doc. No. 2, p. xvii). In fact, Darby contends that his counsel had at least 29 pages left.

The brief that Darby claims was unfairly cramped was his postconviction appellate brief. But, even there, Darby has failed to demonstrate he was unfairly constrained in arguing points that were of colorable merit. To put it bluntly, Darby's problem was not the page limitations, but rather his insistence on litigating every possible point, no matter how frivolous or otherwise lacking in merit, and his rejection of the advice of his numerous court-appointed counsel that many of the arguments he insisted they make, before discharging them because they would not, had no possibility of success. Finally, Darby has been unable to point to one argument he was unable to present that would have any chance of success.

As for any remaining arguments of "cause and prejudice" that Darby may be attempting to make, he has failed to meet the requirement that the "cause" be "something *external* to the petitioner, something that cannot fairly be attributed to him[.]" <u>Coleman v. Thompson</u>, 501 U.S. at 753; <u>see</u> <u>also</u> <u>Arnold v. Dormire</u>, 675 F.3d at 1087. In addition, he has made no showing of prejudice.

With respect to any claim of "actual innocence," the evidence presented at trial was more than sufficient and, in fact, was overwhelming. Moreover, to establish "actual innocence" as a gateway for consideration of claims that have been procedurally defaulted, Darby is required to come forward with new, reliable evidence that he was innocent of the crime of which he was convicted. <u>E.g.</u>, <u>House v. Bell</u>, 547 U.S. 518, 536-37 (2006). This he has not done.

## V. <u>CERTIFICATE OF APPEALABILITY</u>

Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. When the court has rejected a petitioner's claim on the merits, the substantial showing required is that the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)); <u>see also</u>, <u>United States v. Lambros</u>, 404 F.3d 1034, 1036-37 (8th Cir. 2005); <u>Garrett v. United States</u>, 211 F.3d 1075, 1076-77 (8th Cir. 2000). When the court denies a petitioner's claim on procedural grounds without reaching the merits, the petitioner must demonstrate that reasonable jurists would find it debatable that a valid claim for the denial of

constitutional rights has been stated and that the district court was correct in its procedural ruling.

Slack, 529 U.S. at 484.

In this case, reasonable jurists would not find debatable the recommended dispositions of the claims, whether on the merits or on procedural grounds. Consequently, it is recommended that the court not issue a certificate of appealability.

## VI.    ORDER AND RECOMMENDATION

Based on the foregoing, it is hereby **ORDERED** that the parties show cause within the time period set forth below for objecting to the Report and Recommendation as to why Warden Robyn Schmalenberger should not be substituted as the party Respondent in this action. Also, it is hereby **RECOMMENDED** that:

1.    The court order that Robyn Schmalenberger, Warden of the North Dakota State Penitentiary, be substituted as the Respondent in place of the State of North Dakota;

2.    Respondent's Motion to Dismiss (Doc. No. 17) be **GRANTED**;

3.    Darby's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Doc. No. 2) be **DENIED**;

4.    The court certify that an appeal from the denial of the petition may not be taken *in forma pauperis* because such an appeal would be frivolous and cannot be taken in good faith; and

5.    A certificate of appealability not be issued.

## NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 12th day of February, 2013.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge